UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ORBIS CORPORATION,

                              Plaintiff,

v.                                      Case No. 12-CV-1073-JPS

REHRIG PACIFIC COMPANY,

                            Defendant.                      ORDER

---

        This patent suit revolves around U.S. Patent 6,273,259 ("the '259 patent"). Orbis Corporation ("Orbis"), a manufacturer of commercial baking trays, owns that patent, which covers a baking tray now sold as the NPL663 tray. Orbis sells the NPL663 trays solely to Bimbo Bakeries, Inc. ("Bimbo"), and Bimbo's affiliated brands. Several years ago, one of those affiliated brands, Sara Lee Corporation ("Sara Lee") approached the defendant, Rehrig Pacific Company ("Rehrig"), to request that Rehrig design a tray that was both compatible with and similar to the NPL663 tray. Rehrig obliged and designed its SLBT180 tray, which it then began selling to Sara Lee.

        After several years of allowing Rehrig to sell its SLBT180 tray to Sara Lee, Orbis sued Rehrig, alleging that the SLBT180 tray infringed upon Orbis' '259 patent. (Docket #1). Orbis filed suit in this district on October 22, 2012, and the Court, shortly thereafter, set a jury trial to be held on October 21, 2013. (Docket #1, #14). The parties engaged in discovery, which brought with it several rounds of discovery disputes. (*See, e.g.*, Docket #17, #20, #25, #37, #38).

        Thereafter, each party filed its own motion for summary judgment. (Docket #46, #53). Those motions are now fully briefed (#59, #61, #64, #71),

and the Court issues this order, granting Rehrig's motion for summary judgment and dismissing this case.

1. BACKGROUND

The origins of this suit date all the way back to 1999, and involve two corporations that were later acquired by more important players in this suit. The first of those corporations is Norseman Plastics, Ltd. ("Norseman"). (*See* DPFF ¶ 12). Norseman was in the same business as Orbis, designing plastics, including baking trays. (*See* DPFF ¶ 12, 13). The other later-acquired corporation is the Earthgrains Company ("Earthgrains"), a bread supplier that now operates as a subsidiary of Bimbo. (*See* PPFF ¶ 27; DPFF ¶ 49).

In early 1999, Earthgrains needed new baking trays. (*See* DPFF ¶ 49). In connection therewith, on February 3, 1999, it sent a letter to Norseman, requesting that Norseman submit a proposal to manufacture those trays. (DPFF ¶ 49). Earthgrains informed Norseman that it would like two separate prototype designs for the bakery trays, provided desired dimensions for those trays, and suggested that it would likely order approximately 1,000,000 units of whatever baking tray it ultimately settled upon. (DPFF ¶¶ 51, 52, 53). Earthgrains also specified certain necessary features for the product, such as a dropped side for product visibility and the ability for the trays to be placed in multiple positions. (DPFF ¶ 54).

Norseman wanted to compete for Earthgrains' business, and so began ramping up their efforts. They designed two trays, calling them the NPL645 and NPL655. (*See* DPFF ¶ 56). The NPL655 tray is the only one that is important to this suit. It was later renamed the NPL663 tray (which, as discussed above, is the tray in use by Bimbo). (DPFF ¶ 74; PPFF ¶ 29). There is no substantive difference between the two, and both constitute the physical

embodiment of Orbis' '259 patent; Rehrig designed its SLBT180 tray to be compatible with the NPL663 tray, at Sara Lee's request. (DPFF ¶ 74).

After designing the tray, Orbis requested a quote from a manufacturer to estimate how much it would cost to produce the NPL655 trays. The manufacturer responded, providing a price quote, time frame, reject rate, and location of manufacturing, further stating that "[w]arehousing terms to be negotiated." (Docket #55, Ex. F, at RPCDW-000043). The manufacturer further stated that it reserved the right to change its pricing "until sufficient production run has been completed." (Docket #55, Ex. F, at RPCDW-000043).

With that information in hand, Norseman prepared its presentation for Earthgrains, and submitted it to Earthgrains on March 10, 1999. (DPFF ¶ 55).

After that presentation, Earthgrains requested several changes to the basket designs, and Norseman submitted a revised proposal addressing those concerns on March 31, 1999. (DPFF ¶ 58). The revised proposal included extremely detailed information, including the following:

> (1) a specific price quote for manufacturing the NPL655 at the requested number of units (along with a disclaimer that: "This quotation is valid for 30 days from the date of Issue unless otherwise specified herein and is subject to change without notice in relation to material and labor costs variance.");
>
> (2) the dimensions, weight, and material used for the NPL655;
>
> (3) the location at which the NPL655 would be manufactured;
>
> (4) diagrams showing the exact appearance of the NPL655, as well as the product's stacking, positioning, and capacity capabilities;
>
> (5) a list showing that all of Earthgrains' requested features had been met;
>
> (6) drawings and calculations showing the product's ability to be placed in multiple different types of trucks;

(7) terms of sale, including: "Net 30 Days, pending credit approval," and "1-1/2% per month of overdue accounts";

(8) a statement that "Norseman Plastics will honor price quoted throughout term of order provided a purchase order for 1,000,000 units is placed by April 1, 1999…. Norseman reserves the right to adjust price in the event of a major impact to resins pricing."; and

(9) a timeline of availability, establishing when mold construction would be completed after receipt of the order and further stating that production would "commence upon [Earthgrains'] approval of samples."

(Docket #55, Ex. F, at RPCDW-000096–RPCDW-000136). Norseman included a letter with its revised proposal that clarified the changes it had made to comply with Earthgrains' requests and the accompanying price increases. (Docket #55, Ex. F, at RPCDW-000098–RPCDW-000099). The letter also informed Earthgrains that "Norseman is pleased to learn of your approval of our design thus far," and "await[s] your final decision." (Docket #55, Ex. F, at RPCDW-000098–RPCDW-000099). Denny Williams, a former employee at Norseman testified about this presentation that Norseman was "prepared to accept the order and proceed," which would require "creating a supply agreement for execution" and producing production molds. (Williams Dep. at 80:1–8; 131:24–132:24).

Norseman continued to work on refining its design, submitting an update for Earthgrains' approval in June of 1999 and producing test molds in November of 1999. (PPFF ¶¶ 46, 48). Earthgrains eventually placed its order for the NPL655 tray with Norseman in February of 2000, and Norseman initiated production. (PPFF ¶ 57).

Several months later, after production began, Orbis filed for the '259 patent on May 9, 2000. (Docket #48, Ex. A). The patent issued on August 14,

2001, without amendment or revision (though there were some issues with a second application, which is not important for our discussion). (DPFF ¶¶ 79–83).

The remainder of the facts in this case are ultimately irrelevant, because the Court decides the case on the basis of Rehrig's argument under the on-sale bar. Therefore, the Court does not need to go further than to recount that, after several years in which Norseman produced trays for Earthgrains, Orbis acquired Norseman. Thereafter, Orbis was the sole producer of the NPL663 tray, and accordingly was the sole supplier of the tray for Bimbo and its subsidiary brands. Bimbo approached Rehrig to make a compatible tray. Rehrig obliged, making the SLBT180 tray, which is very similar to the NPL663 tray and can be used therewith. Orbis then filed this suit, arguing that Rehrig's SLBT180 tray infringes upon the '259 patent.

2. DISCUSSION

Summary judgment is appropriate when there is no genuine issue of material fact, and one party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252–53 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Patents are presumed valid, and the Court should not invalidate a patent unless the party arguing for invalidity establishes clear and convincing thereof. *See, e.g.*, 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242, 2246 (2011). This is "a heavy burden of persuasion" for the party arguing invalidity. *Microsoft*, 131 S. Ct. at 2246.

Nonetheless, despite those two substantial burdens of proof, the Court finds that Rehrig is entitled to summary judgment on its claim that Orbis' '259 patent is invalid. The evidence adduced during discovery clearly and convincingly establishes that the NPL655 tray was on sale more than one

year before Norseman ever applied for the '259 patent. Therefore, the Court is obliged to hold that the '259 patent is invalid under the on-sale bar found in 35 U.S.C. § 102.

35 U.S.C. § 102 states that "[a] person shall be entitled to a patent unless…the claimed invention was…on sale" more than one year "before the effective filing date of the claimed invention." 35 U.S.C. §§ 102(a–b). The Supreme Court has held that, if an invention has been subject to sale or even offered for sale, that fact prohibits the patenting of the invention. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 66-67 (1998).

This is known as the on-sale bar. *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 996 (Fed. Cir. 2007). To determine whether the on-sale bar applies, the Court must apply a two prong test. *Id.*

First, it must determine whether the invention—in this case the NPL655/NPL663 tray—was "the subject of a commercial sale or offer for sale." *Id.* (citing *Pfaff*, 525 U.S. at 67). This requires the Court to apply standard contract law and the Uniform Commercial Code to determine "whether a particular communication or series of communications amounts to an offer in the contract sense." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047-48 (Fed. Cir. 2001). *See also Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1352 (Fed. Cir.2002).

The second prong requires the Court to examine whether the invention offered for sale was "ready for patenting," and effectively became the patented invention. *Honeywell*, 488 F.3d at 996 (citing *Pfaff*, 525 U.S. at 67); *Scaltech, Inc. v. Retec/Tetra, LLC,* 269 F.3d 1321, 1330 (Fed. Cir. 2001). This "may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were

sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff,* 525 U.S. at 67-68, 119 S.Ct. 304.

      2.1      First Prong: Commercial Sale or Offer

As already mentioned, the first prong requires the Court to examine the facts to determine whether there was a commercial sale or offer for sale of the invention in question more than one year before the filing of the patent. Specifically, the Court must ask whether Orbis sold or offered to sell the NPL655/NPL663 tray more than one year before May 9, 2000, the date on which it filed for the '259 patent. If Orbis did sell or offer to sell those trays before May 9, 1999—the "critical date," one year before filing—then the '259 patent is invalid. The Court has inserted a timeline of relevant events, below. If any of the events occurring before the critical date (the first large circle), constituted a sale or offer for sale, then the first prong is met.



It is clear that none of the pre-critical date occurrences was a sale. At no point therein did Earthgrains agree to purchase the trays from Norseman.

A much closer question, however, is whether any of those occurrences constituted a commercial *offer* for sale. Rehrig asserts that each of those three occurrences—the quote from the manufacturer and the two presentations—were, in effect, formal offers from Norseman that Earthgrains could have accepted. (Def.'s Br. in Supp. 5–14). Of course, Orbis disagrees, arguing that neither the presentations nor the manufacturer quote could have been a commercial offer, because there were still substantial terms and actions that would need to occur before any finalized agreement could be made. (Pl.'s Resp. 14–20).

To determine whether any of those occurrences constitutes an offer, the Court applies general contract law—including the Uniform Commercial Code ("the UCC"), the *Restatement (Second) of Contracts, Corbin on Contracts,* and federal case law on the topic. *See, e.g.*, *Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.,* 322 F.3d 1335, 1347-48 (Fed. Cir.2003); *Group One*, 254 F.3d at 1048. Those sources provide myriad ways to look for an offer.

The *Restatement (Second) of Contracts* defines an offer as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Restatement (Second) of Contracts* § 24.

Meanwhile, the Federal Circuit has made clear that the language used by the parties in communicating with one another is one of the prime factors in determining whether the requisite manifestation of intent exists. The Federal Circuit states that "[l]anguage suggesting a legal offer, such as 'I offer' or 'I promise' can be contrasted with language suggesting more

Page 8 of 17

Case 2:12-cv-01073-JPS   Filed 09/10/13   Page 8 of 17   Document 72

preliminary negotiations, such as 'I quote' or 'are you interested.' Differing phrases are evidence of differing intent, but no one phrase is necessarily controlling." *Group One,* 254 F.3d at 1048. But language, alone, is not entirely dispositive, according to the Federal Circuit. Instead, the Court must also look to the circumstances surrounding the communication, such as any prior dealings between the parties, whether their communications were private or public, whether their communication occurred in reply to a request for an offer, and the detail in the terms of the communications. *See, e.g., Fisher-Price, Inc. v. Safety 1st, Inc.,* 109 Fed. Appx. 387, 392 (Fed. Cir. 2004) (citing 1 *Corbin on Contracts* § 2.2 at pp. 1-2 (Joseph M. Perillo, Rev. ed. 1993); *Restatement (Second) of Contracts* § 26, cmt. c (1981)).

Finally, though the UCC does not specifically define the term "contract," it does offer some guidance on the matter. Under the UCC, an offer for sale need not contain all the material terms of the contract, but must contain "the quantity term." Citing U.C.C. § 2-201, Official Comment 1.[1]

Finally, it is very important to note that acceptance of an offer is not required. "Rather, the focus of the inquiry is whether the offer could have been made into a binding contract by formal acceptance." *E.g. Scaltech*, 269 F.3d at 1328–1329; *Honeywell Int'l Inc. v. Nikon Corp.,* 672 F. Supp. 2d 638, 644 (D. Del. 2009) *aff'd sub nom. Honeywell Int'l, Inc. v. Nokia Corp.*, 400 Fed. Appx. 557 (Fed. Cir. 2010).

Given the foregoing law, it is clear to the Court that both presentations, as well as the quote from the manufacturer, constituted offers.

---

[1]Though, other sources would not require this term be included with specificity. *See Boydstun Metal Works, Inc. v. Cottrell, Inc.*, 519 F. Supp. 2d 1119, 1130 (D. Or. 2007) (citing 10 *Williston on Contracts* § 29:16 (4th ed.), for the proposition that "if the quantity is otherwise ascertainable with reasonable certainty, a contract for sale will be valid.").

### 2.1.1 Presentations to Earthgrains

The Court will address the presentations first. In both, Norseman provided extremely detailed drawings and specifications for the NPL655 tray, along with pricing information, timetables for production, and statements that Norseman guaranteed the prices (absent changing circumstances). Moreover, the presentation was made in reply to a request for a proposal. Without a doubt, Norseman must have known going into either presentation that, if Earthgrains was happy with the proposed price and product, they could immediately accept the price and design on offer. And, while the price list Norseman provided was titled "Quotation," "no one phrase is necessarily controlling." *Group One*, 254 F.3d at 1048; *Fisher-Price, Inc. v. Safety 1st, Inc.*, 109 Fed. Appx. 387, 392 (Fed. Cir.2004) (citing Joseph M. Perillo, *Corbin on Contracts* § 2.2, at 126 (Rev. Ed. 1993), for the proposition that if a quotation comes in reply to a request for an offer or contains language of commitment or detailed terms, it may be treated as an offer). Clearly, the circumstances surrounding the presentations—the high degree of specificity in the product specifications, the proposed price, the already-coordinated manufacturing and shipment notification, and the proposed terms of sale and price guarantee—evidences Norseman's "willingness to enter into a bargain," such that Earthgrains could have accepted the proposal, and the parties would have been bound by it. *Restatement (Second) of Contracts* § 24.

Orbis disagrees, arguing that the presentations could not have constituted an offer, because other competitors were also pitching offers and the parties would still have had to work out multiple steps before entering the final sale stage. That reasoning fails for multiple reasons. To begin, the existence of other competitors pitching for the same project certainly does not

Page 10 of 17

Case 2:12-cv-01073-JPS   Filed 09/10/13   Page 10 of 17   Document 72

preclude the existence of an offer. While that fact might impact the possibility of acceptance, reducing the likelihood that Earthgrains may ultimately accept any of Norseman's offers, it does not change the nature of Norseman's presentation. The existence of other competitors does not change the fact that Norseman would be bound by its presented prices (as it acknowledged on its own price quotation sheet) if selected. Contrary to Orbis' assertions, this is not a case like *MLMC, Ltd. v. Airtouch Commc'n, Inc.*, 215 F. Supp. 2d 464, 480 (D. Del. 2002): there, the alleged offeror testified that price quotes were mere "ballpark figures"; here, on the other hand, Norseman's own quotation sheet recognized the firmness of the price quotes.

Furthermore, the possibility of additional negotiations does not preclude the legal fact that Norseman made an offer. *Honeywell*, 672 F. Supp. 2d at 644, *aff'd sub nom. Honeywell*, 400 F. Appx. 557 ("In the Court's view, however, the fact that further negotiations might arise, or even be expected, does not preclude the AIMS Proposal from being an invalidating offer where, as here, the AIMS Proposal contained the essential terms of an offer and Honeywell manifested its intent to make an offer to Boeing."). The presentations included all of the fine details of product specifications, price, manufacturing location, and shipment timeline. Despite the possibility of further negotiations, those terms were the important ones, and were clearly offered by Norseman to Earthgrains. Earthgrains' representative could have called Norseman immediately after receiving the presentation and told them "We accept your design and pricing; we'd like to order the number of units specified in the quotation, to be manufactured and delivered according to your timeline." Had Earthgrains done so, Norseman would have been bound by the offered terms. (The fact that Earthgrains *did not* do so is legally irrelevant. *Scaltech*, 269 F.3d at 1328–1329.)

Moreover, the fact that Norseman may have been required to produce test-runs of the trays and make small changes to its design before final approval does not preclude the existence of an offer. As above, had Earthgrains simply accepted the proposal in the presentation, Norseman would have been bound to provide the offered services. In fact, it is likely that Norseman would have been ecstatic if Earthgrains had agreed outright to accept the 1,000,000-unit quotation on the exact terms presented in the quotation and presentation. Despite any remaining negotiations or uncertainties at the time of the presentations, both presentations clearly constituted offers from Norseman to Earthgrains.

For all of these reasons, the Court holds that both of Norseman's presentations to Earthgrains constituted commercial offers of the NPL655/NPL663 basket.

### 2.1.2 Quote From Manufacturer

Just as above regarding the presentation, the quote from the manufacturer was an offer. It was based upon specific renderings of a proposed product and provided exact pricing. It included a location of manufacturing, a timeline therefor, a reject rate, and a carve-out allowing the manufacturer to alter the pricing if the production information supplied by Norseman were to change. Again, while additional details needed to be worked out, such a specific pricing estimate manifests that the manufacturer was willing to enter into a bargain on the offered terms. Without a doubt, if Norseman had manifested its acceptance of those terms, it would have viewed the manufacturer as prohibited from raising the products' price for non-carve-out reasons.

As discussed above, "a commercial offer for sale…is 'one which the other party *could* make into a binding contract by simple acceptance.'"

*Hamilton Beach Brands, Inc. v. Sunbeam Products, Inc.*, --- F.3d ----, 2013 WL 4081872, at *7–*8 (Fed. Cir. Aug. 14, 2013) (quoting *Group One*, 254 F.3d at 1048; citing *Lacks Indus.*, 322 F.3d at 1348; *Dana Corp. v. Am. Axle & Mfg., Inc.*, 279 F.3d 1372, 1377 (Fed. Cir. 2002)). Moreover, the fact that such an offer comes from a supplier, rather than the entity that later secures the patent, is irrelevant. *Hamilton Beach*, 2013 WL 4081872, at *5–*6. In *Hamilton Beach*, the Federal Circuit decided that an offer from a supplier to produce a specific number of specified units, at a specified price, within a specific time frame constituted a commercial offer sufficient to create an on-sale bar. *Id.* Similarly, here, the manufacturer offered to produce a specific number of trays for Orbis (which it already had design specifications for), and provided a price for doing so on a specific production schedule. Granted, in *Hamilton Beach*, the Federal Circuit was analyzing a situation in which the patentee had submitted a purchase order to its supplier. *Id.* But, here, the Court sees little difference, because the same pieces of the offer were present, and there was no impediment that could have prevented Norseman from accepting the terms of the manufacturer's offer.

As such, the Court holds that the manufacturer's price quotation was also a commercial offer for sale.

2.2     Second Prong: Ready for Patenting

Given that the Court has found that all three occurrences prior to the critical date constituted commercial offers for sale, the Court must next determine whether the second prong of the on-sale bar is met. And, while it is true that there is no evidence that Norseman had reduced the trays in question to practice before the critical date, Rehrig can still show that the on-sale bar applies if it can establish that Norseman had prepared descriptions or depictions of the tray that could enable a person of ordinary skill in the art

to create the tray. *See, e.g.*, *Pfaff*, 525 U.S. at 66. In fact, the Supreme Court has held that "just because reduction to practice is sufficient evidence of completion, it does not follow that proof of reduction to practice is necessary in every case. Indeed,…one can prove that an invention is complete and ready for patenting before it has actually been reduced to practice." *Id.* The Federal Circuit has just recently reaffirmed this notion, stating that "so long as the descriptions and depictions of the [invention were] sufficiently precise to enable a person of ordinary skill to build the invention," it is proper to conclude that the invention was "'ready for patenting.'" *Hamilton Beach Brands, Inc. v. Sunbeam Products, Inc.*, --- F.3d ----, 2013 WL 4081872, at *7–*8 (Fed. Cir. Aug. 14, 2013) (quoting *Pfaff*, 525 U.S. at 67–68). Thus, the Court must ask whether Rehrig has produced clear and convincing evidence that, at the time of the offer for sale, a person of ordinary skill in the art would have been able to build the invention. *E.g.*, *Hamilton Beach*, 2013 WL 4081872, at *7–*8.

The Court has no doubt that was the case in this instance. To begin, Orbis has admitted that the NPL655 tray—which Norseman presented to Earthgrains and received a quote on the price of manufacturing—was later renamed the NPL663 tray, which is shown in the '259 patent and is still in use. (DPFF ¶ 74, and Def.'s Resp. thereto; PPFF ¶ 29). In fact, the diagrams in the '259 patent are very similar those in Norseman's presentation to Earthgrains. (Compare Docket #1, Ex. 1, with Docket #55, Ex. F at RPCDW-000109–RPCDW-000114, and RPCDW-000117–RPCDW-000121; *see also* DPFF ¶ 74 and Def.'s Resp. thereto). Moreover, Norseman's revised presentation included very precise dimensions, weights, and product materials. (Docket #55, Ex. F, at RPCDW-000100, RPCDW-000108, RPCDW-000115). It also included specific discussion of: stacking ability and positioning; nesting

ratio; deflection; capacity; wall and floor design; and a check off list of all of the tray's features. (Docket #55, Ex. F, at RPCDW-000116, RPCDW-000124, RPCDW-000126). There also exists Earthgrains' own "Performance Data Sheet," by which Earthgrains initially requested proposals. (Docket #55, Ex. F, at RPCDW-000033-RPCDW-000034). That sheet sets forth Earthgrains' requested functions, all of which were listed as met in Norseman's revised presentation, and which form the basis of the '259 patent's functionality. (Docket #55, Ex. F, at RPCDW-000033-RPCDW-000034; RPCDW-000126).[2]

All of this evidence makes the Court confident that "sufficiently precise" depictions and descriptions of the NPL655 tray existed at the time of the revised Earthgrains presentation (if not before then, at the previous Earthgrains presentation or manufacturer quote) to enable one of ordinary skill in the art to build that invention; the Court is therefore obliged to find that the second prong of the on-sale bar is met. *Hamilton Beach*, 2013 WL 4081872, at *7–*8. The amount of evidence presented in support of this contention is at least on par with that submitted in *Hamilton Beach Brands, Inc. v. Sunbeam Products, Inc.*, 3:11-CV-345, 2012 WL 6562220 (E.D. Va. Aug. 13, 2012), and discussed by the district court in that case. And, as can be gleaned from the Court's ample citations, the Federal Circuit readily affirmed that district court decision on appeal. *Hamilton Beach*, 2013 WL 4081872, at *7–*8.

---

[2]In addition to this raft of evidence, the Court also points out that Norseman received a quote from a manufacturer for production of the trays. Simple common sense dictates that Norseman must have had very specific information, which it passed on to the manufacturer, in order to receive a production quote. Otherwise, the manufacturer would have been unable to provide an accurate quote. This certainly is not a dispositive fact, but it, too, supports the Court's conclusion that sufficient descriptions and depictions of the NPL655/NPL663 tray existed prior to the critical date to enable one skilled in the art to build those trays.

### 2.3 Holding that the '259 Patent is Invalid

The Court has found that both prongs of the on-sale bar are met in this case. Accordingly, the Court must now hold that the '259 is invalid under 35 U.S.C. § 102, as having been on sale more than one year prior to its having been filed.

### 3. ADDITIONAL MATTERS

Before wrapping up, the Court must also address a number of outstanding motions to seal. The parties filed six separate motions to seal. (Docket #50, #51, #57, #63, #66, #69). More specifically, Rehrig filed motions to seal material related to its summary judgment brief (Docket #50), response (Docket #57), and reply (Docket #69); Orbis filed motions requesting to do practically the same (Docket #51, #63, #66). The Court has reviewed those motions, as well as compared the redacted copies of the parties' materials to the unredacted copies. From this review, the Court is confident that the parties have good cause for their redactions—the redacted material all deals with proprietary business information that could be damaging to the companies if available for public view. Moreover, the parties have not attempted to redact more information than is necessary. Finally, the Court notes that it has not received any objections, either from the parties or the public, to any of the motions to seal. The Court will, therefore, grant all of the parties' motions to seal.

As for this opinion, the Court has attempted to avoid disclosure of any proprietary information. It also previously warned the parties of its reluctance to issue any portion of the decision under seal. (See Docket #16). It, therefore, files this order unsealed and in full view of the public.

4. CONCLUSION

The Court has found that the '259 patent is invalid under 35 U.S.C. § 102's on-sale bar. The Court is, therefore, also obliged to grant Rehrig's motion for summary judgment and to dismiss this case with prejudice. Having reached a dispositive decision on the basis of on-sale bar invalidity, the Court need not address the remainder of arguments raised by Rehrig in its briefs.

Moreover, in keeping with this decision, finding that the '259 patent is invalid, the Court must also deny Orbis' motion for summary judgment on the issue of infringement.

Accordingly,

IT IS ORDERED that, having found the '259 patent to be invalid under 35 U.S.C. § 102's on-sale bar, Rehrig's motion for summary judgment (Docket #53) be and the same is hereby GRANTED; this case be and the same is hereby DISMISSED with prejudice together with such costs as may be taxed by the Clerk of the Court; and

IT IS FURTHER ORDERED that Orbis' motion for summary judgment (Docket #46) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that the parties' motions to seal (Docket #50, #51, #57, #63, #66, #69) be and the same are hereby GRANTED.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 10th day of September, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge